The opinion of the court was delivered by
Duncan, J.
This was an indictment fo,r blasphemy, founded on an act of assembly, passed in 1700, which enacts, that whosoever shall wilfully, premeditatedly,and'despitefully blaspheme, and speak loosely and profanely of Almighty God, Christ Jesus; the Holy Spirit, or the Scriptures of Truth, and is legally convicted thereof, shall forfeit and pay the sum of ten pounds.
It charges the defendant with contriving and intending to scandalize and bring into disrepute, and vilify the Christian Religion, and the Scriptures of Truth; and that he, in the presence and hearing of several persons, unlawfully, wickedly, and premeditatedly, despitefully and blasphemously, did say, among other things, in substance as follows: “ That tire Holy Scriptures were a mere fable, that they were a contradiction, and that although they contained a number of good things, yet they contained a great many lies,” and the indictment concludes, to the great dishonour of Almighty God, to the great scandal of the profession of the Christian Religion, to the evil example of all others in like case offending, and against the form of the act of assembly in such case made and provided. , -
The jury have fcpnd, that the defendant did speak words of that *399 substance, in the temper and with the intent stated. This verdict excludes every thing like innocence of intention; it finds a malicious intention in the speaker to vilify the Christian Religion, and the Scriptures, and this court cannot look beyond the record, nor take any notice of the allegation, that the words were uttered by the defendant, a member of a debating association, which convened weekly for discussion and mutual information, and that the expressions were used in the course of argument on a religious question. That there is an association in which so serious a subject is treated with so much levity, indecency, and scurrility, existing in this city, I am sorry to hear, for it would prove a nursery of vice, a school of preparation to qualify young men for the gallows, and young women for the brothel, and there is not a sceptic of decent manners and good morals, who would not consider such debating clubs as a common nuisance and disgrace to the city. From the tenor of the words, it is impossible that they could be spoken seriously and conscientiously, in the discussion óf a religious or theological topic; there is nothing of argument in the language; it was the out-poui'ing of an invective so vulgarly shocking and insulting, that the lowest grade of civil authority ought not to be subject to it, but when spoken in a Christian land, and to a Christian audience, the highest offence contra bonos mores; and even if Christianity was not part of the law of the land, it is the popular religion of the country, jm insult on which would be indictable, as directly tending to disturb the public peace. The bold ground is taken, though it has often been exploded, and nothing but what is trite can be said upon it — it is a barren soil, upon which no flower ever blossomed; — the assertion is once more made, that Christianity never was received as part of the common law of this Christian land; and it is added,, that if it was, it was virtually repealed by the constitution of the United States, and of this state, as inconsistent with the liberty of the people, the freedom of religious worship, and hostile to the genius and spirit of our government, and, with it, the act against blasphemy; and if the argument is worth any thing, all the laws which have Christianity for their object — all would be carried away at one fell swoop — the act against cursing and swearing, and breach of the Lord’s day; the act forbidding incestuous marriages, perjury by taking a false oath upon the book, fornication and adultery, et peccatum illud horribile non nominandum inter christianos — for all these are founded on Christianity — for all these are restraints upon civil liberty, according to the argument — edicts of religious and civic tyranny, “ when enlightened notions of the rights of man were not so universally diffused as at the present day.”
Another exception is taken. However technical it may be, and however heinous the offence, still, if it is not charged as the law requires, the plaintiff in error is entitled to the full benefit of the *400 exception. The objection is, that the words are not laid to have been spoken profanely.
We will first dispose of what is considered the grand objection— the constitutionality of Christianity — for in effect that is the question. <
Christianity, general Christianity, is, and always has been, a part of the common law of Pennsylvania; Christianity, without the spiritual artillery of European-countries; for this Christianity was one of the considerations of the royal charter,. and Jhe very basis of its great founder, William Penn; not Chi’istianity founded on any particular religious tenets; not Christianity with an established church, and tithes, and spiritual courts; but Christianity with liberty of conscience to all men. William Penn and Lord Baltimore were the first legislators who passed laws in favour of liberty of conscience; for before that period the principle of liberty of conscience appeared in the laws of no people, the axiom of no government, the institutes of no society, and scarcely in the temper of any man. Even the reformers were as furious against contumacious errors, as they were loud in asserting .the liberty of conscience. And to the wilds of America, peopled by a stock cut off by persecution from a Christian society, does Christianity owe true freedom of religious opinion and religious worship. There is, in this very act of 1700, a precision of definition, and a discrimination so perfect between prosecutions for opinions sei'iously, temperately, and argumentatively expressed, and despiteful railings, as to command our admiration and reverence for the enlightened framers." From the time of Bracton, Christianity has been received as part of the common law of England. I will not go back to remote periods, but state a series of prominent decisions, in which the doctrine is to be found. The King v. Taylor, Ventr. 93. 3 Keb. 507, the defendant was convicted on an information for saying, that Christ Jesus was a bastard, a whore-master, and religion a cheat. Lord Chief Baron Hale, the great and the good Lord Hale, (no stickler for church establishments) observed, “that such kind off wicked -and blasphemous words were not only an offence against God and religio,n, but against the laws of the state and government, and therefore punishable; that to say, religion is a cheat, is to dissolve all those obligations by which civil societies are preserved;' and that Christianity is part of the law of England, and therefore to reproach the Christian religion is to speak in subversion of the laws.” In the ease of The King v. Woolaston, 2 Stra. 884. Fitzg. 64. Raymond, 162. the defendant had been convicted of publishing five libels, ridiculing the miracles of Jesus Christ, his life and conversation; and was moved in arrest of judgment, that this offence was not punishable in the temporal courts, but the eourt said, they would not suffer it to be debated, “whether to write against Christianity generally was not an offence of temporal cognizance.” It was further contended, that it was merely to *401 show that those miracles were not to be taken in a literal but allegorical sense; and, therefore, the book could not be aimed at Christianity in general, but merely attacking one proof of the divine mission. But the court said, the main design of the book, though professing to establish Christianity upon a true bottom, considers the narrations of scripture as explanative and prophetical, yet that these professions could not be credited, and the rule is allegatio contra factum non est admittendum. In that case the court laid great stress on the-term general, and did not intend to include disputes between learned men on particular and controverted points, and Lord Chief Justice Raymond, Fitzg. 66, said, “I would have it taken notice of, that we do ■ not meddle with the difference of opinion, and that we interfere only where the root of Christianity is struck at.” The infoi’mation filed against the celebrated Wilkes was for publishing an obscene and infamous libel, tending to vitiate and ■corrupt the minds of the subjects, and to introduce a total contempt of religion, morality, and virtue, to blaspheme Almighty God, to ridicule our Saviour, and the Christian religion. In the justly admired ' speech of Lord Mansfield, in a case which made much noise at the time — Evens v. Chamberlain of London. Furneaux’s Letters to Sir W. Blackstone. Jlppx. to Black. Com. and 2 Burns’ Eccles. Laiv, p. 95. Conscience, he observed, is not controllable by human laws, nor amenable to human tribunals; persecution, or attempts to force conscience, will never produce conviction, and were only calculated to make hypocrites or martyrs. There never was a single instance, from the Saxon times down to our own, in which a man was punished for erroneous opinions. For atheism, blasphemy, and reviling the Christian religion, there have been instances of prosecution at the common law; but bare nonconformity is no sin by the common law, and all pains and penalties for nonconformity to the established rites and modes are repealed by the acts of toleration, and dissenters exempted from ecclesiastical censures. What bloodshed and confusion have been occasioned, from the reign of Henry IV., when the first penal statutes were enacted, down to the revolution, by laws made to force conscience. There is certainly nothing more unreasonable, nor inconsistent with the rights of human nature, more' contrary to the spirit and precepts of the Christian religion, more iniquitous and unjust, more impolitic, than persecution against natural religion, revealed religion and sound policy. The great, and wise, and learned judge observes, “The true principles of natural .religion are part of the common law; the essential principles of revealed religion are part of the common law; so that a person vilifying, subverting or ridiculing them may be prosecuted at common law; but temporal punishments ought not to be inflicted for mere opinions.” Long before this, much suffering, and a mind of a strong and liberal cast, had taught this sound doctrine and this Christian precept to William Penn. The charter of Charles II. recites, that “ Whereas our *402 trusty and beloved William, Penn, out of a commendable desire to enlarge our English empire, as also to reduce the savages, by gentle and just measures, to the love of civil society, and the Christian religion, hath humbly besought our leave to translate a colony,” &c. The first legislative act in the colony was the recognition of the Christian religion, and establishment of liberty of conscience. Before this, in L646, Lord Baltimore passed a law in Maryland in favour of religious freedom, and it is a memorable fact, that of the first legislators, who established religious freedom, one was a Roman Catholic and the other a Friend. It is called the great law, of the body of laws in the province of Pennsylvania, passed at an assembly at Chester, the 7th of the 12th month, December. After the following preamble and declaration viz.: “ Whereas ye glory of Almighty God, and ye good of mankind, is ye reason and end of government, and therefore government in itself is avenerable ordinance of God; and {forasmuch as it is principally desired and intended by ye proprietary and governor, and ye freemen of ye province of Pennsylvania, and territorys thereunto belonging, to make and establish such laws as shall best preserve true Christians, and civil liberty, in opposition to all unchristian, licentious, and unjust practices, whereby God may have his due, Csesar his due, and ye people their due, from tiranny and oppression on ye one side, and insolency and licentiousness on ye other, so that ye best and firmest foundation may be laid for ye pi'esent and future happiness both of ye governor and people of this province and territorys aforesaid, and their posterity: — Be it therefore enacted by' William Penn, proprietaiy and governor, by and with ye advice and consent of the deputys of ye freemen of this province and counties aforesaid in assembly mett, and by ye authority of ye same, that these following chapters and paragraphs shall be the laws of Pennsylvania and the territorys thereof.
“Almighty God, being only Lord of conscience, Father of lyghts and spirits,' and ye author as well as object of all divine knowledge, faith, and worship, who only can enlighten ye minds, and persuade and convince ye understandings of people in due reverence to his sovereinty over the souls of mankind: It is enacted by the authority aforesaid, yt no person at any time hereafter living in this province, who shall confess and acknowledge one Almighty God to be ye creator, upholder, and ruler of ye world, and that professeth him or herself obliged in conscience to live peaceably and justly under ye civil government, shall in any wise be molested or prejudiced for his or her conscientious persuasion or practice, nor shall, he or she at any time be compelled to frequent or maintain any religious worship, plan or ministry, whatever, contrary to his or her mind, but shall freely and fully enjoy his or her Christian liberty in yt respect, without any interruption or reflection; and if any person.shall abuse or deride any other for his or her different persuasion and practice in a matter of religion, such shall be lookt *403 upon as a disturber of ye peace, and be punished accordingly.” And to the end that looseness, irreligión, and atheism may not creep in under the pretence of conscience, it provides for the observanee'of the Lord’s day, punishes profane cursing and swearing, and further enacts, for the better preventing corrupt communication, “ that whoever shall speak loosely and profanely of Almighty God, Christ Jesus, the Holy Spirit, or Scriptures of Truth, and is thereof legally convicted, shall forfeit and pay 5-pounds, and be imprisoned for five days in the house of correction.” Thus this wise legislature framed this great body of laws for a Christian country and Christian people. Infidelity was then rare, and no infidels were among the first colonists. They fled from religious intolerance, to a country where all were allowed to worship according to their own understanding, and as was justly observed by the learned Chancellor of the associated members of the Bar of Philadelphia, in-the city of Philadelphia, in his address to that body, 22d of June, 1822, the number of Jews was too inconsiderable to excite alarm, and the believers in Mahomet were not likely to intrude. Ever)’ one had the right of adopting for himself whatever opinion appeared to be the most rational, concerning all matters of religious belief; thus, securing by law this inestimable freedom of conscience, one of the highest privileges, and greatest interests of the human race. This is the Christianity of the common law, incorporated into the great law of Pennsylvania, and and thus, it is irrefragably proved, that the laws and institutions of this state are built on the foundation of reverence for Christianity. Here was complete liberty of conscience, with the exception of disqualification for office of all who did not profess faith in Jesus Christ. This disqualification was not contained in the constitution of 1776; the door was open to any believer in a God, and so it continued under our present constitution, with the necessary addition of a belief in a future state of rewards and punishments. On this the constitution of the United States has made no alteration, nor in the great body of the laws which was an incorporation of the common law doctrine of Christianity, as suited to the condition of the colony, and without which no free government can long exist. Under the constitution, penalties against cursing and swearing have been exacted. If Christianity was abolished, all false oaths, all .tests by oath in the common form by the boob, •would céase to be indictable as perjury. The indictment must state the oath to be on the holy Evangelists of Almighty God. The accused on his trial might argue that the book by which he was sworn, so far frtai being holy writ, was a pack of lies, containing as little truth as Eobinson Crusoe. And is every jury in the box to, decide as a fact whether the Scriptures are of divine origin?
/ Let us now see what have been the opinions of,our judges and courts. The late Judge Wilson, of the Supreme Court of the United States, Professor of Law in the College in Philadelphia, *404 was appointed in 1791, unanimously by the House of Representatives of this state to “revise and digest the laws of this commonwealth, to ascertain and determine how far any British statutes extended to it, and to prepare bills containing such alterations and additions as the code of laws, and the principles and forms of the constitution, then lately adopted, might require.” He had just risen from his seat in the convention which formed the constitution of the United States, and of this state; and it is well known, that for our present form of government we are greatly indebted to his exertions and influence. With his fresh recollection of both constitutions, in his course of Lectures, Sd vol. of his works, 113, he states, that profaneness and blasphemy are offences punishable by fine and imprisonment, and that Christianity is part of the common law. It is in vain to object that the law is obsolete; this is not so; it has seldom been called into operation, because this, like some other offences, has been rare. It has been retained in our recollection of laws now in force, made by the direction of the legislature, and it has not been a dead letter. % '
In the Mayor’s Court of the city of Philadelphia, in 1818, one Murray was convicted of a most scandalous blasphemy. He attempted by advertisement to call a meeting of the enemies of persecution; but this ended in mere vapour; the good sense of the people frowned upon it, and he was most justly sentenced. An account of the proceedings will be found in the Franklin Gazette, of the 31st of November, 1818. If the doctrine advanced in the written argument delivered to the court was just, (and it is but justice to the counsel for the plaintiff in error for the court to acknowledge the propriety of his conduct in preferring this course to a declamation in open court,) impiety and profanity must reach their acme with impunity, and every debating club might dedicate the club room to the worship of the Goddess of Reason, and adore the deity in the person of a naked prostitute. The people would not tolerate these flagitious acts, and would themselves punish; and it is for this, among other reasons, that the law interposes to prevent the disturbance of the public peace. It is sometimes asked with a sneer, Why not leave it to Almighty God to revenge his own cause? Temporal courts do so leave it. “Bold and presumptuous would be the man who would attempt to arrest the thunder of heaven from the hand of God, and direct the bolts of vengeance where to fall.” It is not on this principle courts act, but on the dangerous temporal consequences likely to proceed from the removal of religious and moral restraints; this is the ground of punishment for blasphemous and criminal publications; and without any view to spiritual correction of the offender. 4 Bla.C. 59. Fitz. 67. Stark, on Libels, 487.
“ Shall each blasphemer quite escape the rod, And plead the insult's not to man but Gods”
*405 It is not an mito da fe, displaying vengeance; but a law, punishing with great mildness, a gross offence against public decency and public order, tending directly to disturb the peace of the commonwealth. Chief Justice Swift, in his System of Laws, •2 vol. 825, has some very just reasoning on the subject. He observes, “To prohibit the open, public, and explicit denial of the popular religion of a country, is a necessary measure to preserve the tranquillity of a government. Of this, no person in a Christian country can complain; for, admitting him to be an infidel, he must acknowledge that no benefit can be derived from the subversion of a religion which enforces the purest morality.” In the Supreme Cotirt of New York it was solemnly determined, that Christianity was part of the law of the land, and that to revile the Holy Scriptures was an indictable offence. The case assumes, says Chief Justice Kent, that we are a Christian people, and the morality of 'the country is deeply engrafted on Christianity. Nor,/ are we bound by any expression in the constitution, as some have strangely supposed, not to punish at all, or to punish indiscriminately the like attack upon Mahomet or the Grand Lama. The People v. Ruggles, 8 Johnston, 290. This decision was much canvassed in the New York convention, 1821. Debates 463. An article was proposed in the new constitution, declaring that the judiciary { should not declare any particular religion the law of the land. This was lost by a vote of 74 to 41. It is a mistake to suppose that this decision was founded on any special provision in the constitution. It has long been firmly settled, that blasphemy against the Deity generally, or an attack on the Christian religion indirectly, for the purpose of exposing its doctrines to ridicule and contempt, is indictable and punishable as a temporal offence. The principles and actual decisions are, that the publication, whether written or oral, must be malicious, and designed for that end and purpose; both the language of indictments, and the guarded expressions of judges show, that it never was a .crime at the common law, seriously and conscientiously to discuss theological and religious topics, though in the course of such discussions doubts may have been created and expressed, on doctrinal points, and the force of a particular proof of Scripture evidence casually weakened, or the authority of particular important texts disputed; and persons of a different religion, as Jews, though they must necessarily deny the authenticity of other religions, have never been punished as blasphemers or libellers at common law, for so doing. All men, of conscientious religious feeling, ought to concede outward respect to every mode of religious worship. Upon the whole, it may not be going too far to infer, from the decisions, that no author or printer, who fairly and conscientiously promulgates the opinions with whose truths he is impressed, for the benefit of others, is answerable as a criminal; that a malicious and mischievous intention is, in such a case, the broad bonndary.between right and wrong, and that it is to be collected *406 from the offensive levity, scurrilous and opprobrious language, and other circumstances, whether the act of the party was malicious; and since the law has no means of distinguishing between different degrees of evil tendency, if the matter published contains any such evil tendency, it is a public wrong. An offence against the public peace may consist either of an actual breach of the peace, or doing that which tends to provoke and excite others to do it. Within the latter description fall all acts and all attempts to produce disorder, by written, printed, or oral communications, for the purpose of generally weakening those religious and moral restraints, without the aM of which mere legislative provisions would prove ineffectual. ■Tío society can tolerate a wilful and despiteful attempt to subvert its religion, no more thah it would break down its laws — a general, malicious, and deliberate intent to overthrow Christianity, general Christianity. This is the line of indication, where crime commences, and the offence becomes the subject of penal visitation. The species of offence may be classed under the following heads — 1. Denying the Being and Providence of God. 2. Contumelious reproaches of Jesus Christ; profane and malevolent scoffing at the Scriptures, or exposing any part of them to contempt and ridicule. 3. Certain immoralities tending to subvert all religion and morality, which are the foundations of all governments. Without these restraints no free government could long exist. It is liberty run mad, to declaim against the punishment of these offences, or to assert that the punishment is hostile to the spirit and genius of our government. They are far from being true friends to liberty who support this doctrine, and the. promulgation of such opinions, and general receipt of them among the people, would be the sure forerunners of anarchy, and finally of despotism. Amidst the concurrent testimony of political and philosophical writers among the Pagans, in the most absolute state of democratic freedom, the sentiments of Plutarch, on this subject, are too remarkable to be omitted. After reciting that the first and greatest care of the legislators of Rome, Athens, Lacedeemon, and Greece in general, was by instituting solemn supplications and forms of oaths, to inspire them with a sense of the favour of displeasure of Heaven, that learned historian declares, ..that we have met with towns unfortified, illiterate, and without jthe conveniences of habitations; but a people wholly without religion, no traveller hath yet seen; and a city might as well be erected in the air, as a state be made to unite, where no divine worship is attended. Religion he terms ti." -:ement of civil union, and the essential support of legislation. Wo free government now exists in the world, unless where Christianity is acknowledged, and is the religion of the country. So far from Christianity, as the counsel contends, being part of the machinery necessary to despotism, the reverse is the fact. Christianity is part of the common law of this state. It is not proclaimed by the commanding voice of any human superior, but expressed in the calm and mild *407 accents of customary law. Its foundations are broad, and strong, and deep: they are laid in the authority, the interest, the affections of the people. Waiving all questions of hereafter, it is the purest system of morality, the firmest auxiliary, and only stable support of all human laws. It is impossible to administer the laws without taking the religion which the defendant in error has scoffed at, that Seripture which he has reviled, as their basis; to lay aside these is at least to weaken the confidence in human veracity, so essential to the purposes of society, and without which no question of property could be decided, and no criminal brought to justice; an oath in the-common form, otí a discredited book, would be a most idle ceremony. This act was not passed, as.the counsel supposed, when religious and civil tyranny were at their height; but on the'breaking forth of the sun of religions liberty, by those who had suffered much for conscience’ sake, and fled from ecclesiastical oppression. The counsel is greatly mistaken in attributing to the common law the punishment at the stake, and by the faggot. No man ever suffered at common law for any heresy. The writ de hseretico comburendó, and all the sufferings which he has stated in such lively colours, and which give such a frightful, though, not exaggerated picture, were the enactments of positive laws, equally barbarous and impolitic. There is no reason for the counsel’s exclamation, are these things to be revived in this country, where Christianity does not form part of the law of the land! — it' does form, as we have seen, a necessary part of our common law; it inflicts no punishment for a non-belief in its truths; it is a stranger to fire and to faggots, and this abused statute merely inflicts a mild sentence on him who bids defiance to all public order, disregards all decency, by contumelious reproaches, scoffing at and reviling that which is certainly the religion of the country; and when the counsel compared this act against blasphemy to the act against witchcraft, and declared this was equally absurd, I do not impute to him that- which I know his heart abhors, a scoffing at religion, but to the triteness of the topics. It is but a barren field, and must contain a repetition of that whieh has been s«- often advanced and so often refuted. It is not argument. He has likewise fallen into error with respect to the report of the Judges of the Supreme Court on the British statute de religiosis, and of mortmain, parts, of which are not incorporated, as being inapplicable to the state of the country; these statutes were made to resist ibe encroachments of religious bodies, in engrossing great landed estates, and holding them in mortmain, but these are adopted so far as relates to the avoidance of conveyances to tire use of bodies corporate, unless sanctioned by the charter declaring void all conveyances to superstitious uses. The present statute is called the statute de religiosis, from the initiatory words of the act. It clipped the wings of ecclesiastical monopoly, and avoided conveyances to superstitious uses, but had no more relation to the doctrines of ..Christ than of Mahomet; the counsel has confounded the *408 name de religiosis with- the doctrines of Christianity, and drawn a false conclusion; because the statute de religiosis was not applicable to the country, therefore religion itself was not, and because they incorporated only part of the statutes avoiding conveyances to superstitious uses, therefore Christianity was superstition, and is abolished. This argument is founded on misconception, and is a nullity. The plaintiff in error has totally failed to support his grand objection to this indictment, for Christianity is part of the common law. The act against blasphemy is neither obsolete nor virtually repealed, -nor is Christianity inconsistent with our free governments or the genius of the people. ,^-"'
, As I understand this writ of error was taken-out with a view to decide the question, whether Christianity was part of the law of the land, and whether it was consistent with our civil institutions, I have considered it a duty to be thus explicit. No preference is given by law to any particular religious persuasion. Protection is given to all by our laws. It is only the malicious reviler of Christianity who is punished. By general Christianity is not intended the doctrine of worship of any particular church or sect; the law-leaves these disputes to theologians; it is not known as a standard by which to decide political dogmas. The worship of the Jews is under the protection of thelaw, and all prosecutions againstUnitarians have been discontinued in England. The statute of William III, Ch. 3, with its penalties against Anti-Trinitarians, is repealed, and it never was punishable at eommon law; and no partial mode of belief or unbelief were the objects of coercion by the civil magistrate. Whatever doctrines were heretical, were left to the ecclesiastical judges, who had a most arbitrary latitude allowed to them. Freedom from the demon of persecution, and the scourge of established churches, was not on the European, but on our side of the Atlantic. I do not by this allude to any particular church, for the Puritans in turn became persecutors,‘when they got the upper, hand. By an ordinance of 23d of August, 1645, which continued until the restoration, to preach, write or print any thing in derogation, or disapproving of the directory to the established puritanical form of worship, subjected the offender, when convicted, to a discretionary fine, not exceeding 50 pounds. Scofill, 98. While our own free constitution secures liberty of conscience and freedom of religious worship to all, it is not necessary to maintain that any man should have the right publicly to vilify the religion of his neighbours and of the country. These two privileges are directly opposed. It is open, public vilification of the religion of the country that is punished, not to force conscience by punishment, but to preserve the peace of the country by an outward respect to the religion of the country, and not as a restraint upon the liberty of conscience; but licentiousness endangering the public peace, when tending to corrupt- society, is considered as a breach of the peace, and punishable by indictment. Every immoral act is not *409 indictable, but when it is destructive of morality generally, it is because it weakens the bonds by which society is held together, and government is nothing more than public order. This was the opinion of the court in the case of Commonwealth v. Sharpless, 2 Serg. & Rawle, 101. It is not now, for the first time, determined in this court, that Christianity is part of the common law of Pennsylvania. In the case of the Guardians of the Poor v. Greene, 5 Binn. 555. JudgeBiiACKENiiiDGE observed,the church establishment qfi3ng-/«?íc¿ has become a part of the common law, but was the common law in this particular, or any part of it, carried with us in our emigration and planting a colony in Pennsylvania ? Not a particle of it. On the contrary, the getting quit of the ecclesiastical establishment and tyranny, was a great cause of the emigration. All things were reduced to a primitive Christianity, and we went into a new state. And Chief Justice Tilgiiman observes, that every country has its own common law; ours is composed partly of our own usages. When our ancestors emigrated from England, they took with them such of the English principles as were convenient for the situation in which they were about to be placed. It required time and experience to ascertain how much of the English law would be suitable to this country. The minds of William Penn and his followers would have revolted at the idea of an established church. Liberty to all, preference to none; equal privilege is extended to the mitred Bishop and the unadorned Friend.
This is the Christianity which is the law of our land, and I do not think it will be an invasion of any man’s right of private judgment, or of the most extended privilege of propagating his sentiments with regard to religion, in the manner which he thinks most conclusive. If from a regard to decency and the good order of society, profane swearing, breach of the Sabbath, and blasphemy, are punishable by civil magistrates, these are not punished as sins or offences against God, but crimes injurious to, and' having a malignant influence on'society; for it is certain, that by these practices, no one pretends to prove any supposed truths, detect any supposed error, or advance any sentiment whatever.
y 'The reasoning of the counsel of the plaintiff in error is quite con'clusive on the subaltern objection to the form of the indictment. The word profanely used in the act, should have been inserted in the indictment. It is a description of the offence, and though the words blasphemously and despitefully, may be synonymous with profanely, and tantamount in common understanding, yet as the legislature has adopted this word as a description or definition of the crime, the omission is fatal. As for blasphemy at the common law, the indictment cannot be sustained, for the sentence is founded on the act of assembly, and distribution of the fine to the poor, is not a part of a common law punishment. ■ The general rule is, that all indictments on statutes, must state all the circumstances which constitute the definition of the offence, so as bring the de *410 fendant precisely within it; and not even the fullest description of the offence, even the terms of a legal definition, would be sufficient, without keeping to the expressions of the act. A case directly in point is the indictment for perjury^ on the statute; the word wilfully must be inserted, because it is part of the description the act gives of the crime; though in indictments for some offences at common law, that precise term is not essential, but may be supplied by others conveying the same idea; and in indictments on the, black act, the term wilfully is essential, as being used by the legislature, and maliciously, will not suffice. 1 Chitty’s Crim. Law, where the various authorities are referred to. The judgment is for this reason reversed., 1 very much incline to think the indictment is defective on another ground. It should have stated the very words; here it is laid, that among other things, he said in substance as follows. In all indictments for words, the words themselves ought to be set out. In an accusation of this nature, particularly, the words ought to be set out, for it is from the mode and manner the words were spoken, that the malicious intention must appear. One individual attending a long sermon, with particular dogmas of his own always uppermost in his head, and with strong prejudice against the speaker and his sect, whose opinions he might hold to he heretical, and who, from that very prejudice, would put the worst construction on all he said, might conclude from an argument in which no vituperative language was used, that in substance, the speaker said the Scriptures were fabulous, and contained many lies. He might conscientiously suppose, because some favourite opinion of his own was touched, it in substance, amounted to a declaration, that the Scriptures were a fable and a lie. When a man undertakes to give an account of the substance of what he has heard or read, he by no means undertakes for the accuracy of expressions; he avoids that; he only states what was his own conclusion from the whole discourse or writing; the speaker in substance intended it; it would be dangerous either to speaker or preacher, if this latitude were allowed. The thing itself, must be stated explicitly and directly,'in such an open and palpable form, that any one who heard the words, shall know the law to be infringed. A very serious, conscientious discourse, on a subject or text of Scripture, on which the. different sects thought differently, might make the preacher the victim of ignorance, prejudice, fanaticism, or ill will, by taking up a sentence and disjoining it from the whole discom’se and scope of reasoning of the speaker. Even in a declaration in slander in England, it is not sufficient to state, that the defendant among other things said in substance as follows; the words must be set out, though it would be sufficient to prove the substance. But it has been determined in this court, that in an action of slander, the words may be so laid, but it never has been carried so far as to say, this would do in indictments. In an indictment for a libel, *411 Commonwealth v. Sweney, 10 Serg. & Rawle, 173, it was decided, that this mode of laying written slander would not be sufficient.
I am not required to give an opinion on this point, and only throw out this hint to gentlemen who may have occasion to draw bills of this nature.
Judgment reversed.