## ABRAHAM RAINES *vs.* WILLIAM H. WATSON.

### January Term, 1868.

1. By reason of an equal division of this court in opinion, the judgment of the court below, rendering valid a contract for the payment of money, made on the first day of the week, commonly known as the christian Sabbath, is affirmed.

2. QUÆRE? Whether a contract for the payment of money made on the christian Sabbath be valid or void?

*William H. Watson,* surviving partner of the firm of *Ayres & Watson,* merchants, brought suit in July, 1857, in the circuit court of *Jackson* county, against *Abraham Raines,* in covenant. The declaration alleged that *Watson* had on the 7th day of March, 1857, instituted an action of debt in the circuit court of *Jackson* county, for a certain sum of money, against a firm known as *Raines & Kester,* and had sued out an attachment and had the same levied on the property of *Thomas Raines,* a member of the firm, and that the covenant, now sued on, between *Abraham Raines* and the plaintiff, witnessed that, *Abraham* agreed to guarantee the payment of the debt for which he had instituted his action against the firm of *Raines & Kester,* and levied the attachment on the property of *Thomas Raines,* in consideration that the attachment was to be dismissed. This covenant was signed by *Abraham Raines,* in the presence of the attorney who drew it, one *Fleet W. Smith,* and was dated March 9th, 1856.

The declaration was amended and two counts added; the defendant demurred to the whole and each count thereof.

---

*When this cause was submitted at the January term, 1867, Judge *Harrison* was absent from illness. Judge *Maxwell* had been engaged in the court below. The case was heard here by President *Brown* and Judge *Loomis* of the VI circuit.

The defendant filed a plea of *non est factum,* also one of "conditions performed," on which issue was joined, and tendered two others which were objected to by the plaintiff, and the objection was sustained, whereupon he excepted.   The jury found a verdict for the plaintiff for the amount of the debt secured by the covenant, and the court gave judgment thereon.

The first bill of exceptions was taken for the refusal of the court to permit the defendant to file two certain pleas, the first of which was that, "the defendant says that the said supposed covenant was by him made, sealed and delivered to the said plaintiff on the 8th day of March, 1857, (that being the Sabbath or Lord's day,) and by the said plaintiff dated on the 9th day of March, 1857, and this he is ready to verify."   The second plea was that the plaintiff ought not to have and maintain his action, "because he says that the supposed covenant was written, drawn and made by the said plaintiff, a free person, then following the business of merchandizing upon a Sabbath day, and he, the said plaintiff, upon said Sabbath day, did cause and procure this defendant to sign, seal and deliver the same, and this he is ready to verify."

The second bill of exceptions gave the evidence as follows: *Fleet W. Smith* proved the execution of the covenant, and that on Sabbath day, March 8th, 1857, as he was passing along the street in *Ripley,* in front of the plaintiff's store, the plaintiff called him into the store-house, which had goods and merchandise on the shelves in it, and was his place of business, where he found defendant *Raines ;* that plaintiff and defendant talked over their matters and came to a conclusion, which the witness then reduced to writing and was the same writing sued on in the action, and that the same was read over and explained to the defendant, who then signed and delivered it.   That the whole matter took place within an hour, on the Sabbath day.   Whereupon the defendant moved the court to instruct the jury that if they were satisfied from the evidence, that the covenant was, at the instance of the plaintiff, drawn, signed and delivered on the Sabbath

day, at the plaintiff's usual place of business, that in point of law it was void and a nullity. And that the plaintiff having failed to give any evidence as to releasing or dismissing the attachment; that unless they were satisfied from the evidence before them that the plaintiff had released the attachment mentioned in the covenant and had dismissed the said attachment, that the plaintiff ought not to recover in this action. The court refused both instructions and the defendant excepted.

The defendant obtained a supersedeas from the district court of the 9th judicial district of Virginia, from whence the case came here.

No attorney appeared for the plaintiff in error.

*J. M. Stephenson,* for the defendant in error, submitted a printed argument, of which the following is a substantial presentation:

Before entering into an investigation of the *legal questions* involved in this record, (whether a contract made on Sunday can be enforced in the courts of this State,) it may not be inappropriate to examine the moral and religious aspect of the subject, by some reference to the history of the observance of the day called Sunday.

It is maintained that the observance of the first day of the week, called Sunday, as a Sabbath, is unsupported by divine sanction; on the contrary, that its observance depends solely on municipal law; 4 Blackstone, Com., page 63.

For several centuries after the Christian Era, there was no formal observance of the first day of the week. It is true that the apostles and early christians assembled on the first day of the week for worship, in commemoration of the resurrection of the founder of our religion; yet it was not until the reign of Constantine the Great, in 325, that there was any edict requiring the observance of the first day of the week as a day of rest and worship. This edict of the Emperor Constantine, only prohibited work in the cities of the empire; it allowed the country people to follow their usual avocation;

the courts were closed except for the emancipation of slaves. In 425 the Emperor Theodosius the second, prohibited games and theatrical exhibitions. In 538 the council of Orleans prohibited country labors. This celebrated council of Orleans seems to have had a presentiment of *New England Puritanism;* for among other things, it declared " that to hold it unlawful to travel on Sunday with horses, cattle or carriages, to prepare food, and to do anything necessary to the cleanliness and decency of houses or persons, *savors more of Judaism, than of Christianity.*"

Neander, a learned ecclesiastical historian, says that the celebration of Sunday was always like that of every festival, a human institution, far was it from the apostles to treat it as a divine command, &c.

Writers on the subject of the history of the observance of the first day of the week, agree in saying that the custom of calling Sunday, *Sabbath,* indicates the inclination to transfer the character of the Jewish Sabbath to the Christian Sunday. This inclination was manifested among the Puritans of Cromwell's time in England, and especially so among their descendants in New England, from their settlement in America, and it is to be traced in their legislation, and has been the foundation of their judicial action.

Dr. William Paley, one of the ablest writers of the Episcopal church, in his work on moral philosophy, in his 7th chapter to book 4th, under the head of " the Scripture account of Sabbatical Institutions," discusses the subject at large, and collates the Scriptures in relation to the same. In the conclusion of the argument, he uses this language : It will be remembered that we are contending by these proofs, for no other duty upon the first day of the week, than that of holding and frequenting religious assemblies. A cessation on that day from labor, beyond the time of attendance upon public worship, is not intimated in any passage of the New Testament, nor did Christ or his apostles deliver, that we know of, any command to their disciples for a discontinuance upon that day, of the common offices of their profession; a reserve which none will see reason to

wonder at, or to blame as a defect in the institution; that in the primitive condition of christianity, the observance of a new Sabbath would have been useless, or impracticable. Again, he says, the assembling on the first day of the week for the purpose of public worship and religious instruction, is a law of christianity of divine appointment; the resting on that day from our employments longer than we are detained from them by attendance upon these assemblies, is to christians, an *ordinance of human institution.*

St. Paul, says Dr. Paley, evidently appears to have considered the Sabbath as a part of the Jewish ritual, and not obligatory on christians as such. "Let no man therefore judge you in meats or drink, or in respect to holy days, or of new moons, or of the *Sabbath days,* which are a shadow of things to come, but the body is of Christ," 2nd Colossians, 16 and 17.

The argument on this branch of the subject is to prove that the observance of the first day of the week, called Sunday, as a day of rest, is a municipal regulation, and there is nothing in the divine or moral code to prohibit the exercise of mens' ordinary avocations.

The second part of the argument will be to examine the municipal law on the subject, and to make some reference to some of the authorities referred to in the petition of the plaintiff in error.

Judge Blackstone in the 4th volume of his commentaries, page 63, says: "The profanation of the Lord's day is vulgarly called *Sabbath-breaking,* and is punished by the *municipal law,* by a fine of three shillings and four pence, and that by the *laws of England,* no fair or market is allowed to be held on any Sunday, except the *first Sunday in harvest,* on pain of forfeiting the goods exposed for sale." The law does not prohibit (the commentator says,) but rather *allows any innocent recreation or amusement* on the Lord's day *after service is over.* But it prohibits work on that day, or exposure of goods for sale, except mackerel, milk, meat, &c., under the penalty of five shillings. *He considers Sunday as a civil institution, to be regulated by the municipal law.*

It is assumed then, that all acts not criminal *per se*, or *not prohibited by express legislative enactments, are lawful, and will be enforced by the court, no matter on what day the act was done or performed.*

It is seen that there is no common law prohibition as to work on Sunday. The edicts of the Roman Emperors, and the orders of the ecclesiastical councils of Orleans, &c., were of but partial operation, and confirmed rather than otherwise the position above.

The act of 29th Charles the second was the necessary result of the Puritanism of the times of Cromwell. The moral laxity of the public in the religion of the early sovereigns of the house of Stewart, brought about a hypocritical jewish observance of the Sabbath, and which, on the restoration, induced the English parliament to enact the law of the 29th Charles the second, as a compromise between Judaism and a total non-observance of the day of worship and rest.

The English decisions are more or less tinctured with the leaning of the judges to one or other side of the political parties of the times.

The language of the act of 29th Charles the second, is as follows: "No tradesman, artificer, workman, laborer, or other person whatsoever, shall do or exercise any wordly labor, business, or work of their *ordinary calling* upon the Lord's day," &c.

The court of common pleas, in the year 1808, in the case of *Drury* vs. *Defontaine,* 1st Taunton Reports, page 136, at the time presided over by Lord Mansfield as chief justice, expressly decide, that there is no common law prohibition of work on *Sunday ;* the court also interpret the meaning of the act of 29th Charles 2nd.

The case was this: The plaintiff, (Drury) who was a baker by trade, had sent his horse to one Hull who kept a commission stable for the sale of horses by auction, for the purpose of being sold. The defendant came on a *Sunday* to the stable, and after having tried the horse for an hour, requested of Hull that he might carry it to show to Major

Mackenzie, and that Major Mackenzie might try it. Hull told him that the price of the horse at the hammer was one hundred guineas, but if the defendant would bring him back the one hundred guineas it would suffice; that he must either bring the 100 guineas or return the horse by two o'clock at the farthest. If the defendant did not return the horse by two o'clock, the horse should be his own. The horse not not being brought till eight o'clock, Hull refused to take it, and insisted that the sale was complete at two o'clock. The jury found a verdict for the plaintiff.

The argument of Sergeant Best, in opposition to the motion to set aside the verdict, presents the question as to the validity of Sunday contracts in its proper light, and ought to be considered the true exposition of the act of Parliament, 29th Charles, the more especially as chief justice Mansfield concurred with him.

Sergeant Best says "that the language of the act shows that an act not attended with noise and tumult, and likely to disturb the public service of the church, and the devotion of others, such as a sale in a private room or yard, does. not come within the prohibition of this statute." Again, no canon, no opinion to be found in any writers upon ecclesiastical law, treats bargains made on Sunday as illegal. The jewish law prohibited them, but several of the councils have expressly declared that christians shall not judaize.

The defendant in error relies on the position, that at the common law it was lawful to perform on Sunday any act not expressly prohibited. This was the doctrine laid down in case of *Drury* vs. *Defontaine*, by Sergeant Best, and sanctioned by Judge Mansfield in delivering the opinion of the court. Sergeant Best referred to the case of *Macalley*, Cro. Jac., 279: *Wait* vs. *the Hundred of Stoke*, Cro. Jac., 496, and *Rex* vs. *Brotherton*, 1 Strange, 702.

Chief Justice Mansfield in delivering the opinion of the court in the case of *Drury* vs. *Defontaine*, uses this language: "It does not appear that the common law ever considered those contracts as void which were made on Sunday." And in the same opinion, in commenting on the statute of Charles.

2nd, he approves of the decision of the court in the case of *Comyns* vs. *Boyer*, Cro. Elizabeth, 485, in which it was ruled "that a fair holden on Sunday is well enough, for although by the statute of 27th Henry 6, chapter 5, there is a penalty inflicted upon the party that sells on that day, it does not make it void."

This brings me to the examination of the legislation of Virginia on this subject of Sunday contracts.

The first section of chapter 16 of the Code, which is copied from the 9th and 13th Henning's statutes, provides that, "the common law of England, so far as it is not repugnant to the principles of the bill of rights and constitution of this State, shall continue in full force within the same, and be the rule of decision, except in those respects wherein it is, or shall be altered by the general assembly.

We have seen that there is no common law prohibition against any acts on Sunday; in other words, it was lawful to do any act on Sunday not expressly prohibited. Unless then it can be shown that the making of contracts or agreements on Sunday, and the declaring such contracts void, is prohibited by some statute in force, it is maintained that the contract in the case at bar is legal, and should be enforced.

This view of the subject is sustained by a reference to the history of the subject in the revision of 1849. Robinson in his 1st Vol., (new work) in chapter 73, refers to a contest between the revisors and the legislature, as to whether the Sunday provision of the 16th section, before quoted, should form a part of the civil code or a part of the criminal code.

The revisors desired it embraced in chapter 77 of the civil code, but the legislature insisted on putting it in chapter 196, part of criminal code of 1847 and 8.

On page 405, 1st vol. Robinson, will be found what the revisors proposed in lieu of section 16 of chapter 196, and on page 406 the reasons which influenced them in preferring their own to the law as enacted. The law as proposed by the revisors as their 16 section to chapter 77, sustains the view taken of Sunday in the preceding part of this note, to-wit: that the observance of the *first day of the week is but*

*a municipal regulation;* that it has no divine sanction for its observance, or the legislature could not by any enactment dispense with its observance in favor of Jews or others.

The argument deduced from the foregoing, is that the authors of the Virginia law under consideration, did not intend to interfere with the civil contracts of individuals, but simply meant to impose a fine against those who were guilty of Sabbath-breaking. This seems to be the view of Mr. Robinson, as is apparent from the heading of his 73d chapter, and from the observations in various parts of same; and it seems from the petition of the plaintiff in error, that both judges, Summers and McComas were governed in their decisions by this chapter of Robinson.

The remaining question to be considered is, what the plaintiff in error call the morality of the transaction.

It is contended in the petition that the contract should not be enforced because of its *immorality,* being made on Sunday. In answer to this it may be remarked, as was said by Lord Mansfield in the case of *Holman* vs. *Johnson,* 1 vol. Cowper's reports, page 341, "That it sounded very ill in the mouth of the defendant to say the contract made solely for his and his partner's interest and benefit was immoral."·

It appears from the record that Raines & Co., were justly indebted to Watson & Co., a debt of over 300 dollars, that the same was protested for non-payment, that in order to secure the debt an attachment was sued out and levied on the property of one of the firm of Raines & Kester; by agreement this attachment was released; (this was neither illegal nor immoral) and by that release, if Raines is to avoid his contract because it was made on Sunday, Watson loses his debt; for an execution for the judgment has been returned "no property." It is the height of *morality* for Raines to avoid the payment of a just debt, and to take advantage of Watson's good nature in releasing his security for his debt, but the height of *immorality* to endeavor to collect his debt because the contract was made on Sunday. Away with such hypocrisy. If the contract between Watson and Raines was immoral in any respect the immorality consists in the effort

to avoid it. But this case does not come within that class of immoral contracts spoken of in the class referred to from Cowper's reports. The moral contracts that will not be enforced, are such as are *crimes per se*, or such as are made crimes from motives of public policy. A contract to commit a felony would not be enforced, not because of any prohibitory enactment, but from the matter of the offence, and so of a large number of similar contracts to do acts criminal in themselves.

There is another class of cases indifferent in themselves, that the legislature has prohibited from motives of public policy, such as gaming contracts, which will not and cannot be enforced because of special enactments.

It is not deemed necessary to review the many American authorities referred to in the petition, because many of them have no bearing on the case at bar, and because the decisions of the courts of New England are greatly influenced by the character of the legislation of the different States, and because it is not in the power of the writer to say to what extent the common law is in force in those States, the judicial decisions of which are relied on in the petition; their decisions being controlled by practical statutes not in force here.

This question, so far as it appears from the reports, has never been adjudicated in Virginia, and is for the first time before the supreme court of West Virginia for its decision. In the opinion of the writer of this note, the question is one free from doubt, made so by the law making power in the statutes referred to in relation to the binding force of the common law as the rule of decisions in our courts, and by the Sunday law forming part of the criminal code. The fact that the question never has been before the courts of Virginia, is another amongst the arguments that might be adduced in favor of the case; our judges have avoided the *judicial enactment* of rules of moral conduct for the people.

BROWN, President. The interpretation of the statute under consideration induces a review of the legislation on the

subject of the Sabbath by the colony and State of Virginia, whence we derive the present law.

The first act was passed by the general assembly in 1623, and declares:

"That whosoever shall absent himself from divine service any Sunday, without an allowable excuse, shall forfeit a pound of tobacco, and he that absenteth himselfe a month shall forfeit fifty pounds of tobacco." 1 Henning's Statute at Large, 123.

The next act was passed by the general assembly, 1629: "Aact VIII, It is ordered that there bee an especiall care taken by all commanders and others that the people doe repaire to their churches on the Sabbath day, and to see that the penalty of one pound of tobacco for every time of absence and fifty pounds for every months absence sett downe in the act of the general assembly, 1623, be levyed and the delinquents to pay the same, as alsoe to see that the Sabbath day be not ordinarily profaned by working in any imployments or by journeying from place to place." 1 Hen. Stat. at Large, 144.

The next act was passed by the grand assembly at James city, 1642:

"Aact I. In the first place, *Be it enacted* for the advancement of God's glorie and the *weale publique*," &c.

"Itt, That there be an oath administered to the church wardens that they deliver in a true presentment in writing of such misdemeanors as to their knowledge have been committed the year before, whilst they have been church wardens, namely, swearing, prophaning God's name and his holy Sabbathes, abusing his holy word and commandments, contemning his holy sacraments, or anything belonging to His service or worship." 1 Hen. Stat. at Large, 240.

The next act was passed at the same session, 1642:

"Act XXXV. *Be it also enacted and confirmed,* for the better observation of the Sabbath, that noe person or persons shall take a voyage vpon the same, except it be to church or for other causes of extreme necessitie vpon the penaltie of

the forfeiture for such offense of twenty pounds of tobacco, being justly convicted for the same."

"*Be it further enacted and confirmed*, for the better observation of the Sabbath, and for the restraint of divers abuses committed in the collony by vnlawful shooting on the Sabbath day as aforesaid, vnles it shall be for the safety of his or their plantations or corn fields or for defence against Indians, he or they so offending shall forfeit for his or their first offence being thereof lawfully convicted, if he be a freeman, the quantity of twenty pounds of tobacco, and if a servant to be punished at the discretion of his master; and if masters of any such servants be remisse and negligent in the punishment of his servant for the offense aforesaid, he shall be liable to the forfeiture of twenty pounds of tobacco, being justly convicted for the same." 1 Hen. Stat. at Large, 261.

The next act was passed 1657, viz:

"Act 111. The Sabbath to bee kept holy. That the Lord's day be kept holy, and that no journeys be made except in case of emergent necessitie on that day; that no goods laden in boates nor shooting in gunns or the like tending to the prophanation of that day, which duty is to be taken care of by the ministers and officers of the severall churches, and by the commissioners in their places, and the partie delinquent to pay one hundred pounds of tobacco or layd in the stocks, and to take care that servants and others do repaire to their several churches everie Lord's day." 1 Hen. Stat. at Large, 434.

The next act was passed at the same session, 1657, viz:

"Act LII. No arrest on Sabbath dayes. Whereas it hath been the frequent practice of sheriffs and officers for their owne ease and benefitt to repaire to the churches on Sabbath dayes and other publique meetings on purpose to serve executions, warrants and other writts, by which means many times those duties are neglected by such who are in danger of arrests. *It is therefore ordered, and bee it enacted by this present grand assembly*, that no officer or officers shall from henceforth execute any writt or warrants vpon any person or per-

sons in time of exercise or muster for that day nor on the Sabbath day." 1 Hen. Stat. at Large, 457.

The next act was passed 1661, viz:

"Act IX. Sundays not to be profaned. That the Lord's day be kept holy, and that noe journeys be made on that day except in case of emergent necessity; and that noe other thing be used or done that may tend to the prophanation of that day. But that all and every person inhabiting in this country having noe lawful excuse to be absent shall upon every Sunday and the fower holy days hereafter mentioned, diligently resort to their parish church or chapell accustomed then and there to abide orderly and soberly during the time of common prayers, preaching, or other service of God, upon penalty of being fined fifty pounds of tobacco by the county court upon presentment made by the church wardens who are to collect the same with the parish levies. *Provided always*, that this act include not Quakers or other recusants who out of non-conformitie to the church totally absent themselves, but they shall be lyable to such fines and punishments as by the statute of 23d of Elizabeth are imposed on them, being for every months absence twenty pounds sterling, and if they forbeare a twelve month then to give good security for their good behavior, besides their payments for their monthly absences, according to the tenor of the said statute; and that all Quakers for assembling in unlawfull assemblyes and conventicles be fined and pay each of them there taken, two hundred pounds of tobacco for each time they shall be for such unlawfull meeting taken or by the church wardens to the county court, and in case of the insolvency of any person among them, the more able then taken to pay for them, one-half to the informer and the other halfe to the publique." 2 Hen. Stat. at Large, 48.

The next act was passed 1691, viz:

"Act XI. An act for the more effectual suppressing the severall sins and offences of swearing, cursing, profaining God's holy name, Sabbath abuseing, drunkenness, ffornication and adultery.

"Whereas, notwithstanding the many good laws before this time made and still in force, prohibiting swearing, cursing, prophaneing God's holy name, Sabbath abuseing, fornication, and adultery," &c. "And as the said acts and statutes were, at the time of making them, thought to be very good and beneficiall to the commonwealth, (as all of them yet are), so as if the substance of as many of the said lawes, as are necessary to be continued, shall be dejested and reduced into one sole law and statute, and in the same a method prescribed for the punishment of offenders with an account of what penalties the offenders therein shall incur, there is good hope that it will come to pass that the same law, being duly executed, will suppress the aforementioned vices, reforme our lives, and be a means that the blessings of Almightly God be showered down upon us; forasmuch, therefore, as all swearing, cursing and prophaning God's holy name, is forbidden by the word of God, *Be it enacted, &c.*, that no person or persons whatsoever shall from henceforth swear, curse or prophaine God's holy name, and if any person or persons shall offend herein, and shall thereof be convicted by the oath of two witnesses or by confession of the party, then every such offender shall for every time soe offending, forfeit and pay the sum of one shilling; and for as much as nothing is more acceptable to God than the true and sincere service and worship of him according to his holy will, and that the holy keeping of the Lord's day is a principall part of the true service of God, which in very many places of this dominion hath been, and is now prophained and neglected by a disorderly sort of people, *Bee it enacted, &c.*, that there shall be no meetings, assemblies, or concourse of people out of their own parishes on the Lord's day, and that no person or persons whatsoever shall travell upon the said day, and that no other thing or matter whatsoever be done on that day which tends to the prophanation of the same, but that the same be kept holy in all respects, upon pain that every person and persons so offending and being convicted as aforesaid shall loose and forfeit twenty shillings," &c. 3 Hen. Stat. at Large, 71-2.

Jan'y Term,            Raines *vs.* Watson.            1868.

The next act was passed by the general assembly at Williamsburg, 1705. Section 6, re-enacts the prohibition against serving "any writ or precept upon the Lord's day, commonly called Sunday," &c. "And the execution of any writ or precept contrary" thereto declared "null and void." 3 Hen. Stat. at Large, 248.

The next act was passed at the same session, 1705, of which, viz:

"VI. And to the end that the Lord's day, commonly called Sunday, may be kept holy.

VII. Be it enacted," &c., "That if any person, being of the age of twenty-one years or upwards, shall wilfully absent him or herself from divine service at his or her parish church or chapel, the space of one month, (excepting as is excepted in an act of parliament passed in the first year of King William and Queen Mary, intituled, an act for exempting their majesty's protestant subjects dissenting from the church of England, from the penalties of certain laws;) and shall not, when there in a decent and orderly manner continue, till the said service is ended; and if any person shall, on that day, be present at any disorderly meeting, gaming, or tippling, or shall, on the said day, make any journey and travel upon the road, except to and from church, (cases of necessity and charity excepted), or shall on the said day, be found working in their corn or tobacco, or any other labour of their ordinary calling, other than is necessary for the sustenance of man and beast; every person failing or making default in any of the premises, and being lawfully convicted by confession or otherwise before one or more justice or justices of the peace of the county wherein such offence shall be committed, (so that prosecution be made within two months after such default,) shall forfeit and pay for every such offense the sum of five shillings or fifty pounds of tobacco. And if any person or persons herein offending shall refuse to make present payment, or give sufficient caution for the paiment of the fine at the laying of the next parish levy after such offense committed, each party so offending, and not paying or giving security as aforesaid,

shall, by order of such justice or justices before whom such conviction shall be, receive on his or her bare back ten lashes well laid on." 3 Hen. Stat. at Large, 360.

The next act was passed 1786, viz:

"An act for punishing disturbers of religious worship and Sabbath breakers."

Wherein it was enacted among other things, "If any person on the Sabbath day shall himself, be found laboring at his own, or any other trade or calling, or shall employ his apprentices, servants or slaves in labour or other business, except it be in the ordinary household offices of daily necessity or other work of necessity or charity, he shall forfeit the sum of ten shillings for every such offense, deeming every apprentice, servant or slave so employed and every day he shall be so employed as constituting a distinct offence." 12 Hen. Stat. at Large, 336-7.

The next act is the revisal of 1792, which only substitutes in the act of 1786, the indefinite article (a) for the definite article (the) before the word Sabbath in the first line as above quoted, and further changes the fine from shillings to dollars and cents, and with these verbal modifications re-enacts the act of 1786. Rev. Code of 1792, chap. 138, sec. 5, p. 390.

The next act was the revisal of 1819, which re-enacted, *verbatim*, the law of 1792. 1 Rev. Code of 1819, chap. 141, sec. 5, page 555.

The next act was the revisal of 1847 and 1849, viz:

"16. If a free person, on the Sabbath day, be found ladoring at any trade or calling, or employ his apprentices, servants or slaves in labor or other business, except in household or other work of necessity or charity, he shall forfeit two dollars for each offence; every day any servant, apprentice, or slave is so employed, constituting a distinct offence."

"17. No forfeiture shall be incurred, under the preceding section, for the transportation on Sunday of the mail, or of passengers and their baggage. And the said forfeiture shall not be incurred by any person who conscientiously believes that the seventh day of the week ought to be observed as a Sabbath, and actually refrains from all secular business and

Jan'y Term,       Raines vs. Watson.       1868.

labor on that day, provided he does not compel a slave, apprentice or servant, not of his belief, to do secular work or business on Sunday, and does not on that day disturb any other person." Code of 1860, chap. 196, sec. 16 and 17, page 804.

And so the law stands, except as the abolition of slavery may modify its operation as respects free and slave.

A review of this legislation on the subject of the Sabbath, is a sufficient refutation of the idea that the Sabbath is not a holy day of rest and worship of God, as well in the eye of the civil law as of the divine law; and it is equally clear that the Sabbath so recognized and its profanation punished by the legislation reviewed is the christian Sabbath and not the Jewish Sabbath. 1 Rob. Prac. (new); 8 John.. 297; 11 Serg. & Rawle, 400; 2 Strobart, 524, and 6 Gill & J., 274. God having created the world in six days rested the seventh and blessed or sanctified it. Gen. 2; 2, 3.

The re-enactment of the Sabbath on Mount Sinai among the commandments of the moral law was designed not for the Jews alone, but for all who should receive the word of God, and ultimately for mankind. Christ and his apostles never speak of the decalogue but as of permanent and universal obligation. " The Sabbath was made for man." The fourth commandment is as binding as the third and fifth. The chief obligation expressed in the divine law is to sanctify it. Ex. 20; 8; Deut. 5; 12. "Remember the Sabbath day to sanctify it." It is sanctified by works of charity, by prayers, praises and thanksgivings, by the public and private worship of God, by tranquility of mind and by meditation on moral and religious truth in its bearing on the duties of life and the hope of immortality. The other requirement is rest: "Thou shalt not do any work," &c. The ordinary business of life is to be laid aside for the sake of bodily and mental health, and chiefly to secure the quiet and uninterrupted employment of the sacred hours for religious purposes. The spirit of the moral law forbids such uses of the Sabbath day as are worldly, such as amusements, journeying, business, &c., purely secular.

The christian Sabbath is the original day of rest established in the garden of Eden and re-enacted on Sinai, without those requirements which were peculiar to Judaism, but with all its original moral force, and with the new sanctions of christianity.   It commemorates not only the creation of the world, but a still greater event—the completion of the work of atonement by the resurrection of Christ; and as he rose from the dead on the day after the Jewish Sabbath, that day of his resurrection has been observed by christians ever since as the christian Sabbath.   The change appears to have been made at once, and as is generally believed under the direction of the "Lord of the Sabbath."   On the same day, the first day of the week, he appeared among his assembled disciples; and on the next recurrence of the day, he was again with them, and revealed himself to Thomas. From 1 Cor. 11, 20; 14: 23, 40, it appears that the disciples in all places were accustomed to meet statedly to worship and to celebrate the Lord's supper, and from 1 Cor. 16: 1, 2, we learn that these meetings were on the first day of the week.   Thus in Acts 20: 6–11, we find the christians at Troas assembled on the first day of the week to partake of the supper and to receive religious instruction.   John observed the day with peculiar solemnity, Rev. 1: 10; and it had then received the name of the "Lord's day," which it has ever since retained.   For a time such of the disciples as were Jews observed the Jewish Sabbath also; but they did not require this, nor the observance of any festival of the Mosaic dispensation, of the Gentile converts, nor even of the Jews.   Col. 2: 16.

The early christian fathers refer to the first day of the week as the time set apart for worship, and to the transfer of the day on account of the resurrection of the Saviour.

Pliny the younger, pro-consul of Pontus, near the close of the first century, in a letter to the emperor Trajan, remarks that the christians were "accustomed on a stated day to meet together before daylight, and to repeat a hymn to Christ as God, and to bind themselves by a solemn bond not to commit any wickedness," &c.

So well known was their custom understood that the ordinary test question put by persecutors to those suspected of christianity was, "Hast thou kept the *Lord's day ?*" To which the reply was, "I am a Christian; I cannot omit it." Justin Martyr observes that "on the Lord's day all Christians in the city or country meet together, because that is the day of the Lord's resurrection, and then we read the writings of the apostles and prophets; this being done, the person presiding makes an oration to the assembly, to exhort them to imitate and to practice the things they have heard; then we all join in prayer, and after that we celebrate the sacrament; then they who are able and willing give what they think proper, and what is collected is laid up in the hands of the chief officer, who distributes it to orphans and widows, and other necessitous Christians as their wants require."

Sunday is observed by Christians all over the world as the Sabbath of the Lord, and is likewise so recognized by all Christian nations, and especially have we seen it so regarded in our own legislation, that has been the subject of review. It is as much a part of the common law, independent of the statute, that the courts shall not sit on Sunday, as it is that witnesses, jurors and others shall be sworn on the Holy Evangelists of Almighty God. The Sabbath and marriage are institutions of Divine origin, and older than the governments that recognize and regulate their observance.

It is a violation of the moral law to engage in wordly business on the Sabbath and therefore immoral.

It is a mistake to suppose that the expression "found laboring" as used in the statute must be understood as requiring severe physical toil, painful exertion producing weariness, fatigue, exhaustion, or such like. In the act of 1705, the expression was, "*found working,*" *&c.* In the act of 1691, the expression was, *that nothing "be done,"* *&c.* And in the act of 1629, the expression was, "*be not prophaned by working in any employment,*" *&c.* Working and laboring are convertible terms and mean the same thing. In this connection they mean simply being *employed* or *engaged* at, &c.,

and may as well apply to mental labor as to bodily. For a merchant to sell a yard of tape or a lawyer to prepare the pleadings in his case is as clearly within the meaning of the word "laboring" if done in the course of business, and not from necessity or charity, on the Sabbath, as if the whole day were entirely devoted to the acts and business in question. And it would be equally true of a merchant on that day settling his debts, and taking obligations and contracts to secure them, binding others to pay them who did not owe. Nor is the meaning of the word laboring nor the operation of the statute changed or defeated by the fact that it was done publicly or privately.

Bayly, justice, in delivering the opinion of the court, *Finnell* vs. *Ridler*, 5 Barn. & Cres., 406, said, "The spirit of the act, [29 Car. 1, C. 7,] is to advance the interests of religion, to turn a man's thoughts from his worldly concerns, and to direct them to the duties of piety and religion; and the act cannot be construed according to its spirit unless it is to be so construed as to check the career of worldly traffic. And it seems to us that every species of labor, business, or work, whether public or private, in the ordinary calling of a tradesman, artificer, workman, laborer or other person, is within the prohibition of this statute."

In the act of 1705, the expression is "working in their corn or tobacco, or any other labor of their ordinary calling," &c. In the present statute the expression is "laboring at *any* trade or calling." The latter statute is clearly more comprehensive in the expressions quoted than the former. To be within the former statute the working must have been done in some "labor of an *ordinary* calling" and not an *extraordinary* one, it must also have been in the party's *own* calling and not in some *other;* but it is within the latter statute, if done in *any* trade or calling, whether ordinary or extraordinary, and whether in the party's own or any other calling.

It is supposed that calling, as used in the statute, does not comprehend business and other secular labor, but calling means employment and business means employment. See Webster and Walker.

In the act of 1642, masters and servants are all equally punished for doing the acts prohibited on the Sabbath day, the only difference being that the masters are required to inflict the punishment on the servants.    But if trade and calling do not comprehend business and labor, then the master may be punished for employing his apprentices or servants in business or labor, which if done by himself would be lawful.    But such a distinction defeats the object of the statute, which was to prevent the profanation of the Sabbath by the acts forbidden, and it could be of little moment whether that were done by one or another individual.    It would be changing the statute from a general to a partial prohibition, and would be abortive of the end in view.  But the meaning and intent of the legislature is put at rest by the 17th section following, which provides that the forfeiture pronounced in the 16th section shall not be incurred by any person who believes, &c., "and actually refrains from all secular business and labor on that day" &c., provided he does not compel an apprentice or servant not of his belief "to do *secular* work or business on Sunday," &c.

Here the party is himself to refrain from "*all secular business and labor*," and he is not to compel others to do "*secular work or business.*"    It would be unreasonable and unjust to require the excepted party in the 17th section to refrain from more than was prohibited to others in the 16th section.    The two sections are in *pari materia*, and must be construed and considered together.    And the only consistent, sensible, and effective construction that can be given to them is that the prohibition is of all employment in secular work, labor, business, trade or calling on the Sabbath, except as therein excepted.

Thus the statute is uniform, consistent and operative to the same extent upon all, and effective to repress the evil complained of.

The plaintiff, Watson, was a merchant, a trader in goods, and had a store.    He had a debt on two men for which he had sued them and attached the property of one of them; to secure that debt he agreed with the defendant, Raines,

who was brother to the debtor whose property was attached, that he would dismiss the attachment if Raines would become surety for the debt.    The services of an attorney were secured who reduced the agreement to writing, and the obligation was executed, delivered and received, by which the defendant, Raines, became bound to pay a debt he did not owe to the plaintiff, in a certain contingency, the consideration of which undertaking was the agreement or undertaking by the plaintiff, Watson, to dismiss the attachment. And all this was done on Sunday, in the store of the plaintiff, and in the presence of the parties and the attorney together; it was worldly business, it was secular employment, and all the parties present engaged in it; it involved both mental and physical exertion, quite as much as to have sold a bill of goods, large or small, and was as clearly laboring in a trade or calling within the meaning, intent and prohibition of the statute, as it would have been to invite customers into his store, sell goods, and take notes for them, or receive the price or charge them to account.    There is nothing to show nor is it pretended to have been a work of necessity or charity, or otherwise within the exception of the statute.

The statute of Kentucky provides that, "No work or business shall be done or performed on the Sabbath day, unless the ordinary household offices of daily necessity, or other work of necessity or charity; and if any person on the Sabbath day shall himself be found at his own or any other trade or calling; or shall employ his apprentices, servants or slaves, or other persons bond or free in labor or other business, whether the same be for profit or amusement, unless such as is permitted above, he shall be fined two dollars for each offence.    Rev. Stat., p. 265.

Under this statute it was held by the court of appeals of Kentucky that, "a promise of which the whole or a part of the consideration was the performance of work on the Sabbath cannot be enforced.    *Slade* vs. *Arnold*, 14 B, Monroe, Ky., 287.    It was also held a violation of the statute to swap horses on the Sabbath day, and therefore an action founded on a warranty of soundness in the transaction not maintain-

able. *Murphy* vs. *Simpson*, 14 B. Monroe (Kentucky), 419.

In Wisconsin it has been held that a note and agreement of indemnity to a surety, both made on Sunday, are alike invalid, and a recovery on the former can give no efficiency to the latter. *Hill* vs. *Sherwood*, 3 Wis., 343.

In New Hampshire the statute prohibited any person from doing or exercising any labor or business, or work of his secular calling upon the Lord's day, under a penalty, &c. N. H. Laws of 1830, 167. But by Rev. Stat., chap. 118, sec. 1, "The work, labor or business of the person's secular calling shall not be done to the disturbance of others upon the Lord's day." In that State contracts made on the Lord's day are held void or at least incapable of enforcement in the courts. *Frost* vs. *Hall*, 4 N. H., 154. *Shaw* vs. *Dodge*, 5 N. H., 462. *Clough* vs. *Davis*, 9 N. H., 500. *Varney* vs. *French*, 19 N. H., 233. *Clough* vs. *Shepherd*, 31 N. H., 490. *Allen* vs. *Deming*, 14 N. H., 133. *Lewis* vs. *Welch*, 14 N. H., 294. *Smith* vs. *Bean*, 15 N. H., 577. *Woodman* vs. *Hubbard*, 25 N. H., 67. *Smith* vs. *Foster*, 41 N. H., 215.

By the statute of Alabama "no worldly business or employment, ordinary or servile work, (works of necessity or charity excepted,) nor shooting, sporting, hunting, gaming, racing, fiddling, or other music for the sake of merriment, nor any kind of playing done, performed or practiced by any person on the Christian Sabbath," under penalty of two dollars, &c., cited in 5 Ala. Rep., 467. And in Alabama it has been held that a promise made on Sunday was void and could not be enforced in the courts. *Hussey* vs. *Roquemure*, 27 Ala., 281. *Saltmarsh* vs. *Tuthill*, 13 Ala., 390. *Hudson* vs. *Harris*, 10 Ala., 566. *O'Donnell* vs. *Sweeny*, 5 Ala. 467. In the case last above mentioned, Ormond, J., delivering the opinion of the court, said: "It is a settled principle of the common law, that all contracts which are founded on an act prohibited by a statute under a penalty are void, although not expressly declared to be so. *Wilson* vs. *Spencer*, 1 Rand., 76. Comyn on Con., 26. *Collins* vs. *Blanton*, 2 Wilson, 341. *Drury* vs. *Defontaine*, 1 Taunt., 135." "It would, indeed, seem a strange anomaly if a contract, made in violation of a

statute and prohibited by a penalty, could be enforced in the courts of the same country, whose laws are thus trampled on and set at defiance." See also *Price* vs. *Hill*, 9 Porter Rep. (Ala.), 151. *Shipley* vs. *Eastwood*, 9 Ala., 198. *Hooper* vs. *Edwards*, 25 Ala., 528. *Raeny* vs. *Copps*, 22 Ala., 288.

By the statute of Maine, chap. 160, sec..26, it is provided that, "any person who shall do any work, labor or business, (works of necessity or charity excepted) on the Lord's day," shall be punishable by fine.

In Maine, held that a contract made on the Lord's day is void. *Towle* vs. *Larrabee*, 26 Maine, 464, also same principle *Nason* vs. *Dinsmore*, 34 Maine, 391, (in 1852). *Morton* vs. *Gloster*, 46 Maine, 520.

The Pennsylvania statute of 1794, inflicted a penalty of four dollars for "performing worldly employment on the Lord's day," and was held to be violated by driving a public conveyance for hire on Sunday. *Comth* vs. *Jeandell*, 2 Grant's cases, 506. The court says: "The Christian Sabbath is a civil institution older than our Government, and respected as a day of rest by our Constitution; and the regulation of its observance as a civil institution has always been considered to be, and is within the power of the legislature, as much as any other regulations and laws having for their object the preservation of good morals and the peace and good order of society."

Contracts on Sunday are not to be enforced in Pennsylvania. *Hadley* vs. *Snevily*, 1 Watts & Sergt., 477. *Hepner* vs. *Keefer*, 6 Watts, 231. *Berrill* vs. *Smith*, Miles' Pa. Rep'ts of Dist. ct., Phila. *Haydock* vs. *Tracy*, 3 Watts & Sergt., 507. *Morgan* vs. *Richards*, 1 vol. Brown's Pa. Reports, 171. *Carr* vs. *Kending*, Pa. M. Rep., vol. 2, p. 449. *Shuman* vs. *Shuman*, 27 Pa. S. Rep'ts, 90.

See also the same doctrine in Connecticut. *Fox* vs. *Abel*, 2 Connecticut Rep'ts, 541, and *Phalen* vs. *Clark*, 19 Conn. Rep'ts, 421, 1 Root 474.

In Vermont the same doctrine has been held, and no recovery can be had on a contract made on Sunday. *Lovejoy* vs. *Whipple*, 18 Vt., 379. *Adams* vs. *Gray*, 19 Vt., 358.

*Goss* vs. *Whiting*, 27 Vt., 272. *Lyon* vs. *Strong*, 6 Vt., 219. *Sumner* vs. *Jones*, 24 Vt., 317.

In Massachusetts a recovery can not be had in court on a contract made on Sunday. *Pattee* vs. *Greely*, 13 Metcalf, 284. *Gregg* vs. *Wyman*, 4 Cushing, 322. *Merriam* vs. *Stearns*, 10 Cushing, 257; and *Bustin* vs. —— 11 Cushing, 346. *Way* vs. *Foster*, 1 Allen, Mass., 408. *Habel* vs. *Stratton*, 5 Cushing, 539.

The cases of *Greer* vs. *Putnam*, 10 Mass., 312; and *Clapp* vs. *Smith*, 16 Pickering, 247, contra, are not considered as law in Massachusetts, as will be seen by the authorities above cited. So also the case of *Boynton* vs. *Paige*, 13 Wend. See opinion of court by Sargent, J., in the case of *Smith* vs. *Foster*, 41 N. H., 215; and to the same point see *Morton* vs. *Gloster*, 46 Maine, 520; and *Way* vs. *Foster*, 1 Allen (Mass.) 408.

In Ohio it has been held that a contract made in the course of business on Sunday was void and no action can be sustained to recover damages for breach of it. *Sellers* vs. *Dugan*.

In conflict with the authorities referred to, and the doctrine settled by them, are the cases of *Ray* vs. *Catlett*, 12 B. Monroe, 533; and *Bloom* vs. *Richards*, 2 Ohio State Rep'ts, 387. They cannot be considered as settling the law—differently from the numerous decisions before and since above referred to—and it would be giving to those two cases an undue weight to suppose that they could even unsettle the law on the subject.

In New York it was held that a contract made in Connecticut, within the prohibition of the Connecticut statute, was void and could not be enforced in the courts of New York. *Northrup* vs. *Foot*, 14 Wend., 248. Also that a notice cannot be served on Sunday, 20 John., 140. (See also 19 Barb., 581; and 1 Hill, 76, N. Y.)

The English statute of 29, Car. 2, chap. 7, sec. 1, enacts that "no tradesman, artificer, workman, labourer or other person whatsoever, shall do or exercise any worldly labour,

business or work of their ordinary calling upon the Lord's day" under a penalty.

Under this act, held, a contract made on Sunday can not be enforced.   *Finnell* vs. *Ridler*, 5 Barn. & Cress, 406.   11 Eng. Com. Law Rep., 261.   *Smith* vs. *Sparrow*, 4 Bing., 84. 13 Eng. Com. Law, 351.   *Bloxsome* vs. *Williams*.   *Beasley* vs. *Ringold*, 5 Barn. & Ald., 335.   *Williams* vs. *Paul*, 6 Bing. Park, J., in the case of *Smith* vs. *Sparrow*, said that he did not think the court was right in the decision of *Drury* vs. *Defontaine*.

It is claimed that these Sunday acts must be construed strictly; but Best, C. J., commending the opinion of Bayley, J., in *Finnell* vs. *Ridler*, said, "in one of the most able judgments ever delivered, he (Bayley) says the most liberal construction must be put on the statute, because it is the affirmance of the religion which is the basis of the law, of this country," and of which Park, J., said he "never read a more luminous judgment."  *Smith* vs. *Sparrow*, 4 Bing., 74.

In *Finnell* vs. *Ridler*, Bayley, J., said "the act can not be construed according to its spirit unless it is to be so construed as to check the career of worldly traffic."

In *Williams* vs. *Paul*, Park, J., said, "I should be sorry to be supposed to recede from the cases decided on this point, and the principle established to enforce the observance of the Lord's day, which tends so eminently to the advantage of society."

The same view is taken by Nelson, J., of the policy of the Sunday acts in *Northrup* vs. *Foot*, 14 Wend., 248, where he says, "it is a remedial statute, and should be liberally construed."   And this opinion and language of Nelson, J., are cited and approved by Allen, J., in delivering the opinion of the court in *Smith* vs. *Wilcox*, 24 New York Rep'ts.   10 Smith's Report.

The same principle that a Sunday contract can not be enforced in a court of justice has been repeatedly held in the supreme court of Indiana under the provisions of a statute very similar to our own.   *Banks* vs. *Werts*, 13 Ind., 203. *Link* vs. *Clemmens*, 7 Blackf., 479.   *Reynolds* vs. *Stevenson*,

4 Ind., 619. The Indiana statute is, that if any person shall be found at common labor on Sunday he shall be fined, &c.

It has been said that it did not tend to advance the cause of religion or morality for courts of justice to permit a party to take advantage of his own wrong and thus commit a fraud under the pretense of virtue and a regard for the sanctity of the Sabbath. But this is a very incorrect view of the case. Courts of justice do not lend themselves to aid the guilty to escape, neither to aid the equally guilty to enforce an illegal contract. Courts simply leave the parties to themselves. If a party makes a conveyance in fraud of his creditors a court of equity would set it aside for the innocent creditors, but would not interfere for the fraudulent grantor, nor would it aid a fraudulent vendee to enforce the execution of a fraudulent contract; but will rather leave all such parties to lie in the bed they have made for themselves. A court of justice cannot aid a guilty party to an illegal contract to enforce its performance without becoming an abettor of the illegal act. The question is not whether the defendant should be allowed to violate his contract, but whether the plaintiff who has violated the law in making the contract shall be assisted to enforce it. When courts undertake to enforce illegal contracts for the guilty parties, then will a new field of litigation be opened.

After a careful consideration of the subject and review of the statutes and cases I am led to the conclusion with Bayley, J., in the case of *Finnell* vs. *Ridler*, that, "upon principle this statute is entitled to such a construction as will promote the ends for which it was passed, that it applies to private as well as public conduct, and that the contract by plaintiff was within the mischief intended to be suppressed and within the words made use of to suppress it."

If any one, who recognizes the obligation of the moral law which forbids Sabbath-breaking, could entertain a doubt of the character of such acts, the legislature has not left its opinion and meaning in doubt on that subject, for the section of the statute in all its history and in almost all countries is found in connection with like prohibitions of

adultery, fornication, profane swearing, &c., and in the chapter under review the heading is, "of offences against morality and decency." I think that Ormond, J., in *O'Donnell* vs. *Sweeney* expressed the true principle when he said, "it would indeed seem a strange anomaly if a contract made in violation of a statute, and prohibited by a penalty, could be enforced in the courts of the same country, whose laws are thus trampled on and set at defiance."

I am, therefore, of opinion that the plaintiff cannot maintain the present action which rests solely on the illegal obligation to pay a debt the defendant did not otherwise owe, and which differs from many of the adjudicated cases in that there is no subsequent new promise or obligation either express or implied, nor conduct, such as the retention and use of property so acquired, from which a subsequent obligation or promise to pay could be raised.

I think, therefore, that the judgment of the circuit court should be reversed, with costs to the plaintiff in error.

But, as the court is divided, the law affirms the judgment.

Loomis, J. The material facts in this case briefly stated are these: William H. Watson, surviving partner of himself and J. L. Ayres, deceased, instituted a suit in the circuit court of Jackson county on the 7th of March, 1857, against *Thomas* Raines and ―― Kester, a mercantile firm doing business under the name and style of Raines & Kester, to recover the sum of 301 dollars and 68 cents, with interest and cost of protest, being a debt due on a protested promissory note. The plaintiff at the same time caused an attachment to issue from the clerk's office of said court against the property of *Thomas* Raines, one of said firm. While the suit was pending *Abraham* Raines entered into a written covenant with said Watson, binding himself, heirs, &c., to pay the plaintiff the said debt, in consideration that Watson would release and discharge the attachment, and upon the further provision that Watson was not able to collect the debt from the defendants Raines & Kester. By the terms of the covenant Watson was at liberty either to dismiss the

suit at law or prosecute it at his option.    Watson obtained
his judgment at law against the firm of Raines & Kester;
execution issued thereon and was returned by the sheriff,
"No property;" whereupon suit was brought by Watson in
the circuit court of Jackson county against Abraham Raines
founded upon the aforesaid covenant or written guarantee.
The defendant demurred to the declaration and his demur-
rer was sustained to the first count.    The declaration was re-
manded to rules and amended; the cause came on again to be
heard upon the amended declaration; the defendant demur-
red to each count; the demurrer was sustained to the first
count and overruled as to the second count; and defendant,
when the cause came on for hearing put in two special
pleas; one, that the covenant declared on was executed on
Sunday and therefore void; the other a plea of *non est fac-
tum.*    The plaintiff demurred to the first plea and replied
generally to the second.    The demurrer to the first plea was
sustained and the defendant excepted to the judgment of the
court in sustaining the demurrer.    Issue being joined upon
the second plea the jury found for the plaintiff and rendered
a verdict for 301 dollars and 68 cents and interest, and the
court entered judgment accordingly.    In the course of the
trial the defendant moved the court to instruct the jury, that
if they were satisfied from the evidence in the cause that the
said covenant was at the instance of the plaintiff drawn,
signed and delivered on the Sabbath day at the plaintiff's
usual place of business, that in point of law it was void and
a nulity.    The plaintiff having failed to give any evidence
whatever as to releasing the attachment, or as to dismissing
it, or any evidence as to the attachment at all.    The defen-
dant further moved the court to instruct the jury that unless
they were satisfied from the evidence before them that the
plaintiff had released the attachment mentioned in the cov-
enant, and had dismissed the same, the said plaintiff ought
not to recover in this action.    These instructions the court
refused to give, and the defendant excepted.    A supersedeas
was obtained to the judgment, and the cause is now here to
determine mainly whether a contract made on Sunday is for

that reason void. I am not aware that this question has ever been decided in Virginia. Its decision involves an interpretation of the 16th and 17th sections of chapter 196 of the Code of Virginia of 1849, which was the law in force at the date of the covenant above mentioned. They are as follows:

"16. If a free person on a Sabbath day be found laboring at a trade or calling, or employ his apprentices, servants or slaves in labor or other business, except in household or other work of necessity or charity, he shall forfeit two dollars for each offence; every day any servant, apprentice or slave is so employed constituting a distinct offence."

"17. No forfeiture shall be incurred under the preceding section for the transportation on Sunday of the mail, or of passengers and their baggage. And the said forfeiture shall not be incurred by any person who conscientiously believes that the seventh day of the week ought to be observed as a Sabbath, and actually refrains from all secular business and labor on that day; provided he does not compel a slave, apprentice, or servant, not of his belief, to do secular work or business on Sunday, and does not on that day disturb any other person."

It is claimed by the plaintiff in error that the rulings and judgment of the court below were in contravention of this statute: 1st. Because an act done under a penalty is void; 2nd. That an act done by a party contrary to good morals, or even against the principles of sound policy, cannot be the foundation of an action in a court of law, and a recovery cannot be had on it.

The 16th section of the statute above cited is the law relied upon as prohibiting the act in question; that is to say if the act of making and executing the covenant by the parties engaged therein constituted a "*laboring at any trade or calling*" then these parties incurred a penalty each of two dollars; and it is claimed that such covenant is void because done under a penalty; and void, whether the statute declares it so or not.

The case of *Barttell* vs. *Vinor*, Carthew, 252, is relied upon as establishing this doctrine. It is said by Lord Holt in this case "that every contract, made *for or about* any matter or thing which is prohibited and made unlawful by any statute, is a void contract, though the statute itself doth not mention that it shall be so, but only inflicts a penalty on the offender; because a penalty implies a prohibition, though there are no prohibitory words in the statute." Was this contract made *for or about* any matter or thing which is prohibited and made unlawful by statute? The dismissal of the attachment, and the releasing of the attached property, were the subject matters of this contract, or it was the "matter or thing" *for* or *about* which the contract was made. It was not unlawful for the plaintiff Watson to dismiss his attachment in that action, nor to release the property. He may have incurred a penalty for doing on Sunday an act in itself lawful. Had this transaction occurred on any other day no one would pretend that either the contract was void or the subject-matter of it unlawful. This does not fall within the principle involved in the discussion of lord Holt. I am at a loss to see how any contract can come within the principle there laid down unless the *subject-matter* of it be prohibited and made unlawful by statute. In such a case the contract would be void if made on any other day, and would be no more a nullity because made on Sunday.

Our statute prohibits the buying, selling, and transferring of tickets or chances in any lottery. Now a contract made *for* or *about* the buying or selling of lottery tickets, or an obligation made in consideration of such tickets would be void, because the statute prohibits the "matter or thing" about which such a contract is made; it would be void if made on a Sunday, and equally so if made on any other day. But the statute imposes a penalty only on a free person found laboring at any trade or calling on a Sabbath day. Can it be said with propriety that bargain-making, contract-making, or covenant-making is a "trade or calling" in the common or technical meaning of these words—as contra-

distinguished from other trades or callings?    It is true that persons more or less frequently make contracts in the course of their usual transactions, but is *the making generally of contracts*, without reference to particular transactions, a trade or calling?    I think not.    It may come within the calling of an attorney, draftsman, or scrivener to reduce contracts and the like to writing, but no *one* person can make a contract; there must be two or more parties to do it.    What were the facts in this case as to the "*laboring*" done on the Sabbath referred to?    They are set out in the record in the bill of exceptions, No. 2.    "Fleet W. Smith, the subscribing witness, proved that on Sabbath day the 8th of March, 1857, he was passing along the street in Ripley in front of the plaintiff's store and plaintiff called him into the store-house which had goods and merchandize in it, and was the place of business of the plaintiff, and when he went in found the defendant, Raines, there.    Plaintiff and defendant talked over their matters and came to a conclusion which witness then and there reduced to writing.    This writing is the covenant sued on, and the same was read over and explained to defendant who then and there signed, sealed and delivered the same, and that the whole matter took place within an hour's time on said Sabbath day."    The "laboring" done, if any, in and about this transaction was performed by the *witness*, not the parties to the covenant, unless the *talking* which they did is considered labor.    This will hardly be pretended, for if it is, then all are guilty under this law, and none, perhaps, more than the clergyman, who is "*found laboring on Sabbath*," and this too at his "calling."    It may, however, be claimed that the witness was the mutual agent of both parties, that he was, as an attorney, "laboring at his calling," and therefore the maxim applies—"*Qui facit per alium facit per se.*"

The word "laboring," as used in the statute, implies something more than *one* mere physical effort; it imports a continuous bodily exertion put forth in a trade or calling, such an exercise of muscular strength as brings on fatigue.

Neither of the parties, nor their agent, so far as the record discloses, were found "laboring" in any usual sense of this word.

It is claimed that this statute should be read distributively, so as to make the party liable to the penalty if he be found laboring in *any other business* as well as at any *trade or calling*. This is a penal statute and must be construed strictly. Its words are, "if any free person on a Sabbath day be found laboring at any trade or calling, or employ his apprentices, servants, or slaves in labor *or other business*, except in household or other work of necessity or charity, he shall forfeit," &c. The words "other business" seem not to be intended to apply to the person referred to as laboring "at any trade or calling," but to relate only to apprentices, servants, or slaves. The manifest object of the law is to prevent the master from requiring apprentices, servants and slaves, (who it is presumed have neither trade nor calling,) from laboring on Sunday *in other business* than at a "trade or calling" and thus evade the statute with impunity by compelling another to do what would be penal if done by himself. The old statute concerning pretended titles, (R. C. 1819, chap. 103,) imposed a penalty but did not avoid a conveyance, as decided by Roane, Judge, in the case of *Tabb* vs. *Baird*, 3 Call, 411. Perhaps a liberal construction ought to be given even to penal statutes, where the object is to prevent a public mischief, and not to claim the penalty. But in cases of clear violation of this statute the penalty imposed is only two dollars. I do not think the legislature intended to superadd a punishment by rendering void a contract made in good faith, even on Sabbath day, involving interests it may be of vast concern, and made under circumstances of great convenience, though falling, perhaps, a little short of *necessity*. At any rate the law does not declare contracts made on that day to be void, and in the absence of such a declaration it would hardly tend to promote the public morals for courts to enable either party to such a contract to add to his transgression by breaking faith pledged on that day, "and com-

mit a fraud out of assumed regard for the Sabbath." Such were the views held by the court in the case of *Swisher's lessee* vs. *William's heirs.* Wright's Ohio Reports, 754.

Again, it is claimed that an act is void if done by a party contrary to good morals, or even against the principles of sound policy.

It is not pretended that this act was either immoral or illegal in itself except so far as *the doing of it on Sunday* made it so. And although done on that day, it was not illegal as has already been shown, for it does not fall within the class of actions embraced by the words "trade" or "calling." Was the act *contrary to good morals* because done on Sunday? There are doubtless many Christians who would hold it immoral, because they attach a peculiar sanctity to the first day of the week; but there are many Christians in our State, whose piety and sincerity none can question, the Seventh-day Baptists for example, (and some other denominations, I believe,) who attach the same sanctity to the seventh day of the week, and religiously keep Saturday as the Sabbath, and follow their usual avocations on Sunday. I am not dealing with the religious or sectarian feature of the question, but simply with its legal aspect. Our law regards no one day of the week as being more holy than another, but rather all days alike holy. This is evident from the 17th section of the same statute; it provides: "No forfeiture shall be incurred under the preceding section for the transportation on Sunday of the mail or of passengers and their baggage. And the said forfeiture shall not be incurred by any person who conscientiously believes that the seventh day of the week ought to be observed as Sabbath, and actually refrains from all secular business and labor on that day," &c. As to the fact whether there is, or is not, *divine sanction* for the observance of the first day of the week, we are not required to determine; but it is manifest that the legislature did not appoint it as a Sabbath or day of rest because of any such supposed sanction for its observance; for if they did, it was a daring and impious exercise of leg-

islative power thus to attempt a modification of the divine mandate so as to suit the beliefs (however conscientious) of Baptist, Jew, or any other sect, and dispense with its observance as to them. Again, to hold that contracts are void merely because made on Sunday would create most perplexing anomalies in business transactions. Those who believe Saturday to be the Sabbath and keep it as such may lawfully do business on Sunday. A person executes his note on a Sunday to a Seventh-day Baptist, for a lawful consideration; this note it is claimed is void as to the maker, because as to him the act was done under a penalty; but it can not be void as to the holder for the same reason, because the act was not done under a penalty as to him. Here then is a contract between two parties, void as to one and valid as to the other. The holder has a legal right to enforce its payment, but the maker is under no legal obligation to pay it. The Jew may lawfully sell to the Christian on Sunday, but the latter when payment is demanded may successfully invoke the court to relieve him from an obligation incurred in violation of the law, and while sinning against his own conscience. The innocent suffer loss, for the guilty may take advantage of their own wrong. It is easy to multiply illustrations of the unsoundness of the proposition. By our laws a marriage promise is regarded in the light of a civil contract. Such promises are, perhaps, as frequently made on a Sunday as on any other day; and the marriage itself is often celebrated on Sunday. Now it is claimed in the argument that to make a contract on Sunday is contrary to good morals, and against sound public policy, and that such a contract is for that reason void. But it will hardly be pretended, I think, that either strict morality or a sound policy would require that such marriage contract should be held void, and the marriage itself a nullity, because consummated on a Sabbath, and thus make illegitimate the children of numerous parents throughout the State. No saving can be made in favor of contracts of this character, for the law makes no distinction. All contracts made on a Sabbath are alike void, without regard to consequences to the parties or

to the interests of society, if it be true that the mere making of them on a Sabbath renders them void.   I should be led to question the soundness of a policy that would declare such contracts void, not only for the foregoing reasons but for many others that might be assigned.   A deed, for example, or other contract, might, through inadvertence, ignorance, or mistake of the parties, be misdated, and after lapse of time be found by reference to the calender to bear date on a Sunday.   There might be great difficulty in establishing the fact that it was in truth executed at a different date. But it is needless to pursue this branch of the question further.   It never was contemplated by the law-makers to confer immunities and superior religious privileges upon those who worship on Sunday in preference to those who observe the seventh day as the Sabbath.   All questions or doubts touching the morality of the transaction, so far as the statute law is concerned, at once vanish when it is remembered that our laws establish no particular religion nor religious belief.   Church and State are wisely kept separate.   Freedom and toleration in religion are characteristics of our State and Federal governments.   (See Virginia Bill of Rights, article 16.   Act for establishing religious freedom.   Code, chapter 76, pages 408 to 410.   Constitution of United States, 1 article of amendments.)

Wisdom and experience teach us that man should refrain from labor at least one day in seven, and it is obvious there would be great advantages in having the day of rest fixed at regular periods.   To fix such a day and to enjoin cessation from labor thereon is undoubtedly within the scope of legislative authority, whether the day selected be the *first* or any other day of the week.   The legislature has wisely selected the Christian Sabbath to be observed as a day of rest, not for the purpose of recognizing that day as being sacred above other days, but because the religious feelings and belief of the majority of our people would lead them to observe and keep it as a day of rest independently of legislative action.   From "principles of sound policy" then, a

day has been by law appointed on which free persons are required to refrain from laboring at any trade or calling, and inhibited from employing *apprentices, servants or slaves in labor or other business.* Having shown that the act complained of was not a "*laboring at any trade or calling,*" it can not be regarded as violating either the principles or sound policy of the law. Under a similar but more stringent statute in England it was decided that a sale of goods made on Sunday, which is not made in the exercise of the ordinary calling of the vendor or his agent, is not void at common law or by the statute of 29 Char., 11, c. 7. That statute provided "that no tradesman, artificer, workman, laborer or other person whatsoever shall do or exercise any worldly labor, business or work upon the Lord's day," also, "that no person or persons whatsoever shall publicly cry, show forth, or expose to sale any wares, goods or chattels whatsoever upon the Lord's day." The case is reported in 1st Taunton, 130. *Drury* vs. *Defontaine.* The plaintiff, a banker by trade had sent his horse to Hull, who kept a commission stable for the sale of horses by auction, for the purpose of being sold. The defendant came on a Sunday to the stable, and after trying the horse an hour, requested Hull that he might carry it to show to Major Mackenzie that he might try it. Hull told him the price was a hundred guineas; but if defendant would bring him back £100 it would suffice. That he must either bring the £100 or return the horse by two o'clock at the farthest. If defendant did not return it by two o'clock the horse should be his own. The horse was not brought back till eight o'clock and Hull refused to receive it. Suit was brought for the £100. The question was whether the contract of sale being made on Sunday was void.

Mansfield, Ch. J., held, "we can not discover that the law has gone so far as to say that every contract made on Sunday shall be void, although under these penal statutes to bring this case within the act we must pronounce that either *Drury* or *Hull* worked within their ordinary callings on Sunday. The sale of horses by private contract was not *Drury's*

ordinary calling, nor was it *Hull's;* his calling was that of a horse auctioneer, and he was not acting within his ordinary calling in selling his horse by *private* contract."

The transportation on a Sunday of passengers and their baggage is not forbidden by the statute.  Sunday traveling is not always necessary, though it may sometimes be convenient or desirable to engage in it.  The exempting clauses in the law clearly indicate the intention of the legislature to be to appoint a day of rest, recurring at regular intervals, on which persons shall cease from laboring at their trades or callings.  Such labor is attended generally with more or less of noise, is done publicly, and tends to disturb the quiet, repose, and devotion of others, and must cease upon that day, so that all may share in the blessings of rest.  If the law-maker deemed the object of the statute secured, even when the transportation of passengers and their baggage is allowed, surely the single act of these parties privately done in a private room is neither a violation of its spirit nor its policy.  This act was not passed to compel any religious observance, nor to give preference to any religious doctrine or denominational sect, nor to impose restrictions upon conscience, nor to indicate one day as being paramount in excellence to another.  The day to be selected is but a question of expediency, and its establishment a municipal regulation.

The American authorities cited are decisions from the New England States, Pennsylvania, Michigan, Ohio and Alabama. The statutes under which these decisions were made are more comprehensive than ours, prohibiting not only labor at any trade or calling, but *any manner of worldly business* save acts of necessity or charity.

The case of *Sellers* vs. *Dugan*, 18 Ohio Reports, 489, relied on by the plaintiff in error, is overruled in the case of *Bloom* vs. *Richards*, Warden's Ohio Reports, vol. 1, page 387.

I am of opinion, therefore, that the mere making of a contract on Sunday is not prohibited by the statute of this State.

Jan'y Term,                Raines *vs.* Watson.                1868.

As to the remaining question whether the court below erred in refusing the instructions asked for, I am of opinion that it did not.    The defendant relied upon his demurrer, the two special pleas, and the plea of conditions performed. The covenant itself virtually released the attached goods, and operated as a dismissal of the attachment.

The judgment is affirmed.

JUDGMENT AFFIRMED.